

ORIGINAL
By Fax

FILED
2019 APR -5  PM 3:49

1  Bonny Sweeney (SBN 176174)
2  Stephanie Cho (SBN 291903)
   **HAUSFELD LLP**
3  600 Montgomery Street, Suite 3200
   San Francisco, CA 94111
4  T: (415) 633-1908
5  F: (415) 633-4980
   bsweeney@hausfeld.com
6  scho@hausfeld.com
7
   Michael Hausfeld
8  **HAUSFELD LLP**
9  1700 K Street NW
   Suite 650
10 Washington, DC 20006
11 T: (202) 540-7200
   F: (202) 540-7201
12 mhausfeld@hausfeld.com
13

14          **UNITED STATES DISTRICT COURT FOR THE**
15             **CENTRAL DISTRICT OF CALIFORNIA**
16
17  ROY MANOJKUMAR SAMATHANAM,)  Case No. CV 19 - 02626 - JFW-PLAx
18                    PLAINTIFF,  )  Complaint for:
19         v.                      )  1) Torture
20  NANDASENA GOTABAYA             )  2) Civil Assault
    RAJAPAKSA, A.K.A. GOTABAYA     )  3) Civil Battery
21  RAJAPAKSA,                     )  4) Intentional Infliction of Emotional
                                   )     Distress
22                    DEFENDANT.   )  5) False Imprisonment
23                                 )
                                   )  **JURY TRIAL DEMANDED**
24                                 )
25
26  Plaintiff Roy Samathanam alleges as follows:

PAID
APR - 5 2019
Clerk, US District Court
COURT 4612

27
28

- 1 -
COMPLAINT

# ORIGINAL

FILED
By Fax

2019 APR -5  PM 3: 49

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:

1  Bonny Sweeney (SBN 176174)
2  Stephanie Cho (SBN 291903)
   **HAUSFELD LLP**
3  600 Montgomery Street, Suite 3200
4  San Francisco, CA 94111
   T: (415) 633-1908
5  F: (415) 633-4980
6  bsweeney@hausfeld.com
   scho@hausfeld.com
7

8  Michael Hausfeld
   **HAUSFELD LLP**
9  1700 K Street NW
10 Suite 650
   Washington, DC 20006
11 T: (202) 540-7200
12 F: (202) 540-7201
   mhausfeld@hausfeld.com

13

14 ## UNITED STATES DISTRICT COURT FOR THE

15 ## CENTRAL DISTRICT OF CALIFORNIA

16

17 ROY MANOJKUMAR SAMATHANAM,)  Case No. **CV19 - 02626**-JFW-PLA

18              PLAINTIFF,  ) Complaint for:

19      V.                  ) 1) Torture
20 NANDASENA GOTABAYA        ) 2) Civil Assault
   RAJAPAKSA, A.K.A. GOTABAYA ) 3) Civil Battery
21 RAJAPAKSA,                ) 4) Intentional Infliction of Emotional
22                          )    Distress
              DEFENDANT.    ) 5) False Imprisonment
23                          )
                           ) JURY TRIAL DEMANDED
24                          )
25 _____)

26 Plaintiff Roy Samathanam alleges as follows:

27

28

- 1 -
COMPLAINT

# I.   STATEMENT OF THE CASE

1.     Roy Samathanam, a Canadian citizen, was brutally tortured in the island nation of Sri Lanka by security forces under the control of an American citizen. That American was Gotabaya Rajapaksa ("Gotabaya" or "Defendant"). After Gotabaya's brother was elected President of Sri Lanka in 2005, Gotabaya left his job as an IT specialist at Loyola Law School in Los Angeles and became Sri Lanka's Secretary of Defense. Gotabaya took charge of the Sri Lankan military and police forces and launched a violent crackdown on the political opposition, singling out the Tamil community—an ethnic minority whose civil rights, language, and ethnic identity were systematically marginalized by the Sri Lankan government.

2.     Between 2005 and 2015, an untold number of Tamil civilians disappeared into the torture chambers of security forces under Gotabaya's command. At the time, the government was locked in a bitter civil war with a separatist rebel group called the Liberation Tigers of Tamil Eelam ("LTTE"), also known as the Tamil Tigers. But the Rajapaksa government's crackdown was not limited to Tamil Tiger fighters. Many innocent Tamils were arrested and abused under the thinnest pretext of supporting the separatists.

3.     Roy Samathanam ("Roy" or "Plaintiff"), a Tamil Canadian, was one of these innocent victims. On September 14, 2007, Roy was arrested by Sri Lankan police acting under the authority of Gotabaya Rajapaksa. He was falsely accused of illegally importing a GPS device. When he refused to pay a bribe for his release, he was taken into custody and detained until August 2010. During this time, Roy was repeatedly beaten with metal pipes, clubs, and rifle butts and called a "Tamil slave." His jailers threatened to rape and kill his wife and child. They denied him medication. They forced him to watch as they beat, burned, and electrocuted other prisoners. Terrified for his life and for his family, Roy eventually signed a forced confession. Roy's experiences followed the same script as countless other Tamils who languished or lost their lives in Sri Lanka's detention centers.

4.     The violence Roy endured at the hands of Defendant Gotabaya's security forces has a name under American and international law: torture.

## II.     JURISDICTION AND VENUE

5.     Under 28 U.S.C. § 1331, this Court has federal-question jurisdiction over Plaintiff's torture claim, as it arises under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note) ("TVPA").

6.     Under 28 U.S.C. § 1332(a)(2), this Court has diversity jurisdiction over Plaintiffs' California-law tort claims for assault, battery, and intentional infliction of emotional distress because the matter in controversy exceeds $75,000 and the parties are a citizen of a State and a citizen of a foreign State. Plaintiff is a citizen of Canada. Defendant is a dual-citizen of the United States and Sri Lanka.

7.     Alternatively, under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' California-law tort claims. These claims are so related to Plaintiff's federal TVPA claims that they form part of the same case or controversy.

8.     Venue is proper under 28 U.S.C. § 1391(b)(3) because Defendant is subject to the Court's personal jurisdiction in this judicial district.

## III.     PARTIES

### A.     Plaintiff

9.     Plaintiff Roy Manojkumar Samathanam is an ethnic Tamil and a citizen of Canada. In 2005, he traveled to Sri Lanka and married his wife. When she became pregnant, they decided to remain in Sri Lanka until the child was born. Roy's life was interrupted in 2007 when Sri Lankan security forces under the Defendant's control stormed his house, falsely accused him of terrorism, and forced him into a three-year ordeal of torture and harsh imprisonment. That ordeal left Roy with lasting physical and emotional trauma, which he continues to suffer at home in Toronto, Canada.

### B.     Defendant

10.     Defendant Gotabaya Rajapaksa is a citizen of the United States and Sri Lanka and a resident of Colombo, Sri Lanka's capital.

11.     Born in Sri Lanka, Gotabaya immigrated to the United States in or around 1990, following a decades-long career in the Sri Lankan military. On information and belief, he worked as the Unix System Administrator of Loyola Law School in Los Angeles, California. Gotabaya's brother, Mahinda Rajapaksa, was elected as President of Sri Lanka in or around November 2005. Around that same time, Gotabaya was appointed by his brother to serve as Secretary of Defense of Sri Lanka. From 2005 to 2015, Gotabaya oversaw the daily operations of the Ministry of Defense and was in charge of the Sri Lankan military and police forces. He left office after his brother's defeat in the 2015 presidential elections.

12.     Defendant Gotabaya currently holds no public office.

## IV.    FACTS

**A.     Under the Rajapaksa government, the torture of Tamils in detention was a feature,
not a bug, of their national security strategy.**

13.     Ethnic Tamils have faced persecution since Sri Lanka gained independence from the United Kingdom in 1948. The Sri Lankan government is dominated by officials of Sinhalese origin—the island's majority ethnic group, who speak a language called Sinhala and mostly practice Buddhism.  Since 1948, the Sri Lankan government enacted numerous laws and policies that disenfranchised and marginalized the Tamil population. Through education quotas and a discriminatory language policy, the government marginalized Tamils, gradually rendering them second class citizens in their own country.

14.     From the mid-1950s to the early 1980s, a violent Sinhalese-nationalist movement carried out a series of massacres against Tamils, with the complicity of government forces. After one such massacre in 1983, a violent civil war broke out between the Sri Lankan government and a separatist rebel army, the Tamil Tigers (or "LTTE"). Lasting from 1983 to 2009, the conflict included egregious human rights violations by both sides and left an estimated 100,000 or more  dead or disappeared.

15.     In the midst of an internationally brokered ceasefire, Defendant's brother Mahinda Rajapaksa was elected President in 2005. A fierce promoter of Sinhalese-Buddhist nationalism, Mahinda Rajapaksa built a strong-arm campaign to end the conflict with the Tamil Tigers through a final military solution. As Secretary of Defense, Gotabaya Rajapaksa was the chief architect of this campaign, targeting Tamil opposition with little distinction between civilians and armed combatants.

16.     The Rajapaksa government enacted a series of laws that gave the security forces wide-ranging powers of arrest and prolonged detention without trial. These laws created sweeping and vague definitions of "unlawful activities," allowed forced confessions to be used as evidence in court, and gave absolute immunity to officials who carried out torture.

17.     While torture remained officially prohibited under Sri Lankan law, in reality it was an essential part of the Rajapaksa Regime's strategy to intimidate the Tamil population into submission. Throughout the war years—and even after—the U.S. Department of State's annual country report on human rights has documented Sri Lanka's torture problem.[1]

**B.     Gotabaya's power over the military and police forces was extensive and effective.**

18.     The Defendant, Gotabaya Rajapaksa, became Secretary of the Sri Lankan Ministry of Defense on or around November 25, 2005 and held that position at all times relevant to this action.

19.     As Secretary of Defense, Gotabaya commanded all agencies of the Sri Lankan military and police forces, including the Terrorism Investigation Department ("TID"). Gotabaya exercised operational control over these police forces through a chain of command that included the Additional Secretary of Defense, the Inspector

---

[1] *See, e.g.*, U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, 2008 Country Reports on Human Rights Practices: Sri Lanka, Feb. 25, 2009, https://www.state.gov/j/drl/rls/hrrpt/2008/sca/119140.htm.

General of the Police, and Deputy Inspector General of Police. They reported to Gotabaya. And Gotabaya reported to his brother, President Mahinda Rajapaksa.

20.   An ex-military man, Gotabaya was a hands-on leader of the military and police forces. He personally involved himself in assigning and overseeing police investigations. According to his agents' public statements, Gotabaya held regular meetings with his subordinates to coordinate strategies, plan operations, and receive reports.[2] In an interview on May 6, 2009, a senior police official in Colombo explained Defendant's Gotabaya's role in overseeing the security forces:

> Actually, the main person responsible for ensuring good security in Colombo is Secretary of Defence [sic] Gotabaya Rajapaksa. We have to update him on our progress weekly, furthermore, the Inspector General of Police also keep [sic] on the constant go by inquiring about investigation on a daily basis. Senior DIG Nimal Mediwake gives us his utmost support as well. The Secretary of Defence is our strength; he has succeeded in bringing all of us together as one team, which has resulted in the success of our investigations.[3]

21.   On information and belief, Gotabaya was the chair of the National Security Council. He provided the critical link between police and army operations and the political leadership of his brother, the President. In his own words, Gotabaya described his security forces as a tightly controlled organization:

> Every small aspect was very important because it is like a chain. It is not a single Force or service, but it was the effort of a complete team. The President at the top coordinated and gave leadership.[4]

---

[2] *See* Business Today, *Deputy Inspector General of Police – Sisira Mendis* [Interview], April 28, 2009, http://www.businesstoday.lk/printarticle.php?articleid=23.
[3] Business Today, *Senior Superintendent Of Police - Anura Senanayake* [Interview], May 6, 2009, http://www.businesstoday.lk/printarticle.php?articleid=201.
[4] Business Today, *Defense Secretary Gotabaya Rajapaksa: The Unshakeable Will* [Interview], May 2, 2010, http://www.businesstoday.lk/printarticle.php?articleid=2434.

22.     Gotabaya's "complete team" included the officers who detained and tortured Plaintiff Roy Samathanam.

**B.      Into the gulag: Roy Samathanam's initial arrest and torture.**

23.     In 2005, Roy took advantage of a lull in the civil war to travel to Sri Lanka from his home in Canada and marry the woman who is now his wife. He and his wife rented a home in Colombo, the capital city. When she became pregnant they decided to remain in Sri Lanka until the child was born.

24.     From time to time, Roy assisted a friend with the importation of goods for a computer electronics shop. In September 2007, his friend imported 600 mobile phones to Sri Lanka that were delivered to Roy's house, waiting for his friend to pick them up the next day.

25.     In the early morning hours of September 14, 2007, plain-clothed men carrying machine guns arrived at Roy's home. Roy and his wife were asleep and were awakened by the gunmen knocking at their door. The men identified themselves as officers of the Terrorism Investigation Department ("TID") and asked to search his home. Roy agreed and they entered. The unopened boxes of cellular phones that Roy helped import for his friend were in his hallway. When the officers opened the boxes and saw the cellular phones, they demanded to see the clearing invoice. Roy showed them the forms associated with the shipment; he explained that the goods belonged to his friend's business. The officers told Roy that there was a GPS device in the boxes, and that this was illegal. They did not, however, point out to Roy any such GPS device.

26.     The officers told Roy that if he paid them approximately 25,000 Sri Lankan rupees they would leave him alone; if not, they would take him to the TID headquarters for interrogation. When Roy told the officers he did not have the money to pay for his release, they arrested him.

27.     Roy was placed in a silver Mercedes van, handcuffed, and blindfolded. His pregnant wife and their child were placed under house arrest by TID officers. The officers drove Roy around Colombo for some time, while they threatened to kill him

1 and dump his body. Later that morning, he was transported to the TID detention facility
2 in downtown Colombo.

3      28.    On arrival, the TID officers took Roy into the headquarters, handcuffed
4 him to a chair in an office, and questioned him about the shipment of cellular phones.
5 Roy was then taken to the office of Sergeant Abdeen, where he was handcuffed to a
6 desk.

7      29.    Roy was detained by the TID under a Detention Order signed by the
8 Additional Secretary of the Ministry of Defense, Sunil S. Sirisena, a subordinate of
9 Defendant Gotabaya. The Detention Order stated that he was detained to prevent him
10 from "acting in a manner prejudicial to the national security or to the maintenance of
11 public order" after importing telecommunications equipment from Singapore without
12 permission.

13      30.    At or around 10:00 am, Roy was taken to see the Officer in Charge of the
14 detention facility, Prasanna de Alwis. Officer de Alwis informed Roy that it was illegal
15 to possess a GPS device and interrogated him for approximately 15 minutes. Officer
16 de Alwis accused Roy of operating the Tamil Tigers' intelligence wing in Toronto,
17 Canada.

18      31.    Between September 2007 and November 2008, Roy was detained by the
19 TID without access to a lawyer, without being brought before a magistrate for an
20 arraignment, and without having his detention reviewed by an independent court.

21      32.    Roy spent the first eight months—from September 2007 to April 2008—
22 imprisoned at the TID Detention Center in Colombo. He was isolated from local Sri
23 Lankan prisoners and held with a few other foreign nationals in Sergeant Abdeen's
24 office.

25      33.    There, Roy was kept handcuffed to a desk at all times, and forced to sit or
26 lie on the floor in a painful position. The detention center did not supply a pillow,
27 mattress, or chair or other furniture. During Roy's time in custody, guards would
28 routinely threaten to kill him, calling him a "Canadian Tiger." Roy was given limited

1  amounts of food and water and was frequently deprived of his diabetes medication—
2  causing him sometimes to urinate himself.

3      34.    Approximately two or three times a week, guards would enter Sergeant
4  Abdeen's office to beat and interrogate Roy and other detainees. Roy was chained into
5  painful positions. The guards beat Roy with metal pipes or hard rubber clubs. They
6  yelled at him to confess that he was a member of the Tamil Tigers. These beatings and
7  prolonged stress-positions caused Roy to suffer severe physical pain—he is disabled to
8  this day.

9      35.    The torture was also psychological. Throughout Roy's detention, the TID
10  officers subjected Roy to terrifying threats and ethnic insults. They threatened to arrest
11  and rape his wife and demanded that she pay a bribe to secure his release. They
12  threatened to shoot Roy in his head. They also forced Roy to watch as they stripped
13  other detainees naked and beat them.

14  **B.    International observers—but still no freedom.**

15      36.    Several international observers came to the TID Detention Center while
16  Roy was detained there. Within a few days of his arrest, Roy received a visit from a
17  Canadian official with the Department of Foreign Affairs and International Trade,
18  whom Roy came to know as "Mr. Norman," and an employee with the Canadian High
19  Commission in Colombo.  Mr. Norman told Roy that he would "see what I can do" to
20  address his arrest.

21      37.    In October 2007, Manfred Nowak, the United Nations Special Rapporteur
22  on Torture made an official inspection of the TID detention center. Roy saw Mr. Nowak
23  but did not have the opportunity to speak with him. In his subsequent report to the
24  United Nations, Mr. Nowak described receiving numerous reports of torture at the TID
25  detention center in Colombo and named Sergeant Abdeen as one of the perpetrators.[5]

26

27  ――――――――――――――――――

28  [5] UN Human Rights Council, Report of the Special Rapporteur on torture and other cruel,
inhuman or degrading treatment or punishment, Manfred Nowak: mission to Sri Lanka, 26 February
2008, A/HRC/7/3/Add.6, available at: https://www.refworld.org/docid/47d683cf2.html.

The Sri Lankan government was given an opportunity to review and respond to Mr. Nowak's report, which it did.

38.    On or around October 19, 2007, officials from the International Committee for the Red Cross ("Red Cross") visited the TID detention center and met with Roy. He was provided with a registration card, documenting his detention. Roy explained to them that he had no mattress to sleep on and, as a result of their intervention, he was given a thin mattress in early December 2017.

**C.    "No one can help you here": the December 2007 torture session.**

39.    On or around December 17, 2007, Roy overheard a phone call between Officer-in-Charge Prasanna de Alwis and Defendant Gotabaya Rajapaksa. They were discussing his case.

40.    Later that evening, Roy received a particularly brutal torture session at the hands of TID officers. That night, the detention center's second-in-command, Inspector Peiris, entered the room where Roy was being held, accompanied by several off-duty guards. Inspector Peiris told Roy that he was not entitled to a Red Cross mattress. The guards pulled the mattress away from Roy, telling him to kneel down, which he did. Peries and the other officers began to kick Roy in the stomach, repeatedly yelling at him and saying that they should kill the "Canadian LTTE." The officers beat him with the butt-ends of their T-56 assault rifles. One prodded his rifle into the side of Roy's chest while Peries and the others punched and kicked him in the face, abdomen, arms, and legs. Roy suffered a swollen left wrist, injured knees, and pain in the stomach and groin area as a result of this beating.

41.    The following morning, the Officer-in-Charge Prasanna de Alwis, sarcastically asked Roy what had happened to him the previous night. He then warned Roy not to tell the Red Cross about the beating that he had received. He told Roy that he would be released if he signed a confession, and that these types of beatings would not happen anymore once he signed a confession. He told Roy that Sgt. Abdeen could write up the paperwork but if Roy refused to sign the confession, the TID would arrest

1  his wife and child and imprison them in the detention center. Roy told Officer de Alwis
2  that he wanted to see a lawyer, to which de Alwis responded, "You can't have a lawyer.
3  No one can help you here."

4  **D.     Transfer to the Boosa Detention Camp**

5         42.    In or around May 2008, Roy was transferred to the TID's Boosa Detention
6  Center in southern Sri Lanka. His transfer order was signed on May 11, 2008 by
7  Additional Secretary of Defense S. Heittiarachchi—a subordinate of Defendant
8  Gotabaya in the Ministry of Defense. Roy remained there until late July 2008.

9         43.    At Boosa, Roy was kept in solitary confinement in a small cell without a
10 toilet or water. He was forced to urinate in a bottle and defecate in a plastic bag.

11        44.    Each day, Roy's captors took him to an interrogation room for
12 questioning. There he was forced to watch the brutal torture of other detainees. Guards
13 hung prisoners upside down. They poured gasoline and chili peppers into plastic bags
14 and tied them over prisoners' heads, and then beat them with iron pipes and wooden
15 poles. The guards beat, burned and sexually assaulted female detainees. Roy was forced
16 to watch these beatings and threatened with the same treatment.

17 **E.     Forced confession**

18        45.    In late July 2008, Roy was temporarily taken back to the TID detention
19 center in Colombo. He was pressured to confess to being a member of the LTTE's
20 international intelligence wing. His captors threatened to arrest his wife, rape her, and
21 kill his child if he refused to confess. In early August 2008, to protect his wife from
22 threats, Roy wrote a false confession that he had imported an illegal GPS device for
23 the LTTE. He was then sent back to Boosa Detention Camp.

24        46.    Roy was finally charged on or about November 4, 2008 with illegally
25 importing a GPS device and aiding and abetting the LTTE—based on his forced
26 confession. After nearly three years in continuous custody during which time the Roy
27 was denied bail and a substantive trial had not started, Roy's lawyer negotiated a plea
28 agreement. On August 19, 2010, in order to stop the torture and threats against his

1  family, he pleaded guilty to possession of a GPS device and paid a fine of 500,000 Sri
2  Lankan rupees (approximately $2,860 USD). The other charges were dropped. Roy
3  was released from detention on August 27, 2010.

4      47.    Following Roy's release from detention in 2010, he recounted his story to
5  the local newspaper and as a result the Sri Lankan government refused to give police
6  clearance for his relatives to leave the country.

## V.    GENERAL ALLEGATIONS

**A.    Defendant is liable under the command responsibility doctrine.**

10      48.    Under the doctrine of command responsibility, Defendant Gotabaya
11  Rajapaksa is liable for the violent abuses inflicted on Plaintiff by his subordinates,
12  agents, or co-conspirators in the Sri Lankan military and police forces. At all relevant
13  times, the Secretary of Defense stood at the pinnacle of the Sri Lankan military and
14  police forces, reporting directly to the President. The Secretary of Defense exercised
15  effective control over a chain of command extending down to the officers at the TID
16  Detention Center and Boosa Detention Camp who abused Plaintiff. This degree of
17  control gave Defendant the practical ability to ensure that forces under his command
18  complied with international law, including the prohibition of torture.

19      49.    Defendant Gotabaya had actual and constructive knowledge of the acts
20  alleged herein. Gotabaya knew that Plaintiff was detained at the TID Detention Center:
21  Plaintiff overheard the Officer-in-Charge of that Center discussing Plaintiffs' detention
22  with Gotabaya by telephone.

23      50.    Further, at all relevant times, Defendant knew or should have known of
24  the pattern of systematic torture committed by his subordinates against Tamil civilians.
25  U.N. Special Rapporteur Manfred Nowak specifically visited the TID Detention Center
26  in October 2007 and included visceral accounts of torture in his report to the United
27  Nations. The Nowak report was published online and conveyed to the Government of
28  Sri Lanka, which filed an official response. It could not have escaped Gotabaya's

1  attention that allegations of torture—at his Ministry's detention centers—were being

2  formally and openly discussed at the United Nations.

3      51.     As Secretary of Defense, Defendant had a duty to investigate, prevent, and

4  punish violations of international law—including torture—committed by members of

5  the military and police forces under his command. Defendant breached that duty by

6  failing or refusing to take action to prevent or punish his subordinates' unlawful acts.

7  **B.    Defendant is liable for engaging in a conspiracy or common plan with
        members of the military and police forces to subject Tamil detainees to
        torture.**

8

9

10     52.     Defendant is liable to Plaintiff for his injuries, because the acts described

11 herein were committed in furtherance of a conspiracy or common plan among members

12 of the Sri Lankan military and police forces to persecute perceived supporters of Tamil

13 separatism. The Defendant and his co-conspirators, including officers in the TID

14 Detention Center and Boosa Detention Camp, conspired to violate international and

15 domestic law and carried out a series of overt acts in furtherance of this conspiracy,

16 including detaining and torturing Plaintiff and forcing him to witness the torture of

17 others. Defendant refused to prevent or punish such violations, a refusal that furthered

18 the conspiracy. In addition to being personally liable for his own actions, Defendant is

19 jointly and severally liable for the actions of his co-conspirators, which were all

20 undertaken in furtherance of the conspiracy.

21 **C.    Defendant is liable as a principal for the unlawful acts of his agents in the
        Police and Military Forces of Sri Lanka.**

22

23     53.     At all relevant times, there was an actual or assumed agency relationship

24 between Defendant Gotabaya and his subordinates, agents, and co-conspirators in the

25 military and police forces of Sri Lanka.

26     54.     The Officer-in-Charge of the TID Detention Center, Prasanna de Alwis,

27 and other TID officers violently abused Plaintiff while acting within the scope of this

28 agency relationship. Plaintiff's abusers acted under the actual or apparent authority of

1  the Defendant and for the benefit of Defendant's common plan or scheme to persecute

2  Tamil civilians.

3         55.    Further, all acts or omissions alleged during Plaintiff's detention at the

4  TID Detention Center and Boosa Detention Camp were ratified by Defendant

5  Gotabaya. He had actual or constructive knowledge of the abuses committed at these

6  prisons; among other sources, UN Special Rapporteur Nowak's report put him on

7  notice that torture was occurring under his watch. Yet Defendant did nothing to

8  investigate, prevent, or punish these abuses, enabling them to continue.

9         56.    Despite the Defendant's knowledge of his subordinate's misconduct, no

10  disciplinary action was taken and Plaintiff was kept in the custody of his abusers.

11  **D.**    **Extraordinary circumstances in Sri Lanka toll any statute of limitations and**

12         **make exhaustion of local remedies futile.**

13         57.    Any applicable statute of limitations is tolled by the exceptional

14  circumstances of (1) Plaintiff being detained and incapacitated until August 27, 2010,

15  (2) Defendant retaining control of the military and police forces until January 2015,

16  and (3) Defendant's infrequent return trips to the United States after leaving office. All

17  three circumstances rendered it impracticable—and unsafe—for Plaintiff to bring this

18  action at an earlier date. *See Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir.

19  1996) (tolling limitations for human rights claims until former president was out of

20  office).

21         58.    Seeking to exhaust judicial remedies in Sri Lanka would also expose

22  Plaintiff to a grave risk of reprisal: Gotabaya Rajapaksa continues to exert a powerful

23  influence over extremist nationalist groups and elements of the military and police

24  forces. At the same time, corruption, bias,  and a lack of judicial independence still

25  mark the Sri Lankan legal system. Political and military leaders enjoy effective

26  impunity against any legal accountability for human rights abuses. Given the lack of

27  judicial independence and the risk of reprisal, Plaintiff has no adequate and available

28

remedy in the courts of Sri Lanka. *See Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 830 (9th Cir. 2008) (discussing futility exception to exhaustion of local remedies).

## VI.   CAUSES OF ACTION

### COUNT I

### TORTURE IN VIOLATION OF THE TORTURE VICTIM PROTECTION ACT

59.   The Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

60.   The acts described herein constitute torture as defined in the Torture Victim Protection Act, § 3(b)(1), note following 28 U.S.C. § 1350, which provides a cause of action for acts of torture committed under color of foreign law, regardless of where they were committed or the citizenship of the victims or perpetrators.

61.   The acts described herein caused Plaintiff severe pain and suffering, both physical and mental. Month after month in detention at the TID Detention Center and the Boosa Detention Camp, the Plaintiff was routinely beaten with metal pipes, rifle butts, and other objects. He was chained into excruciating positions for appalling lengths of time—causing severe pain and bodily injury. The Plaintiff's captors also forced him to watch the electrocution, suffocation, burning, and rape of other detainees during interrogation sessions—causing severe emotional distress. The Plaintiff was placed in imminent fear of death by repeated threats to summarily execute him. And finally, Plaintiff endured his captors' threats to detain, rape, and kill his wife and child until he reached his breaking point and agreed to make a false confession.

62.   Plaintiff's torture did not arise from and was not inherent in or incidental to lawful sanctions.

63.   At the time these acts occurred, Plaintiff was in the custody and physical control of members of the Sri Lankan military and police forces under the Defendant's direct control.

64. The acts described herein were inflicted deliberately and intentionally for purposes that include obtaining a confession, punishing Plaintiff for his perceived opposition to the Rajapaksa government, and on the discriminatory basis of Plaintiff's Tamil ethnicity.

65. The acts described herein were inflicted under actual or apparent authority or color of law by members of the Sri Lankan military and police forces, including the Defendant.

66. The actions of the Defendant and his subordinates, agents, or co-conspirators in the Sri Lankan military and police forces were outside the scope of their lawful authority and in violation of the laws of Sri Lanka. Article 11 of the Sri Lankan constitution enshrines freedom from torture as a fundamental right. Torture is also a criminal offense under Sri Lanka's Torture Act No. 22 of 1994. That Act implements Sri Lanka's international obligation to prohibit torture under the United Nations Convention Against Torture and Inhuman and Degrading Treatment.

67. As a direct and proximate result of this torture, Plaintiff has suffered damages in an amount greater than $75,000, the precise amount to be determined at trial.

68. In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT II

## CIVIL ASSAULT

69. Defendant's subordinates, agents, and co-conspirators threatened to torture and kill Plaintiff. Plaintiff—who was forced to watch other prisoners endure horrific and potentially lethal torture—reasonably believed that his abusers were about to carry out that threat.

70. The threats to Plaintiff's welfare directly and proximately caused him to suffer fear, psychological trauma, and emotional distress.

71.     Plaintiff is entitled to compensatory damages in an amount greater than $75,000, the precise amount to be determined at trial.

72.     In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT III

### CIVIL BATTERY

73.     By severely beating Plaintiff with metal pipes, rubber clubs, rifle butts, and other objects, Defendant's subordinates, agents, and co-conspirators caused Plaintiff to be touched in an intentionally harmful way.

74.     The beatings were malicious and non-consensual, and they directly and proximately caused physical injury to Plaintiff's limbs, abdomen, and groin.

75.     Plaintiff is entitled to compensatory damages in an amount greater than $75,000, the precise amount to be determined at trial.

76.     In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

77.     The acts of Defendant's subordinates, agents, and co-conspirators, including the arbitrary detention and physical and psychological abuse of Plaintiff were outrageous and conscience-shocking. Plaintiffs' abusers, acting under the direct control of the Defendant and in furtherance of Defendant's common plan, intended these abuses to cause Plaintiff to suffer severe emotional distress.

78.     The acts described herein directly and proximately cause Plaintiff to suffer mental pain and suffering.

79.     Plaintiff is entitled to compensatory damages in an amount greater than $75,000, the precise amount to be determined at trial.

80.   In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT V

### FALSE IMPRISONMENT

81.   The acts described herein constitute actionable false imprisonment.

82.   Defendants' subordinates, agents, or co-conspirators arbitrarily and unlawfully detained Plaintiff without warrant, probable cause, articulable or notice of charges, and failed to accord him due process. Plaintiff was denied access to a lawyer and denied being brought before a magistrate in a timely manner. He was continuously detained for three years without formal charge. While in detention, he was coerced— under torture and threats of violence to his family—to confess, and that coerced confession was used against him.

83.   The delays and denials of due process described above were unreasonable and at no time did Plaintiff consent to such delays and denials.

84.   These abuses were carried out under the direct control and actual or apparent authority of the Defendant and in furtherance of Defendant's common plan to persecute Tamils.

85.   Plaintiff's prolonged arbitrary detention in deplorable prison conditions directly and proximately cause physical and mental pain and suffering. The Defendant's acts or omissions were a substantial factor in the harm inflicted upon Plaintiff, including Defendant's failure to prevent or punish the acts described above, his ratification of such acts, and his participation in a common plan to persecute Tamils, which included such acts.

86.   Plaintiff is entitled to compensatory damages in an amount greater than $75,000, the precise amount to be determined at trial.

1    87.    In addition, Defendant's acts and omissions were deliberate, willful,

2 intentional, wanton, malicious, and oppressive, and should be punished by an award of

3 punitive damages in an amount to be determined at trial.

4                                **PRAYER FOR RELIEF**

5 To the extent permitted by law, Plaintiff seeks judgment against the Defendant and the

6 following relief, according to proof:

7

8    (a)    Compensatory damages;

9    (b)    Punitive damages; and

10   (c)    Reasonable attorneys' fees, costs, and expenses; and

11   (d)    Such other relief as the Court may deem just and proper.

12

13 DATED: April 5, 2019

14                                          /s/ Bonny E. Sweeney

15

16                                          Bonny E. Sweeney
                                            Stephanie Cho
17                                          **HAUSFELD LLP**
                                            600 Montgomery Street
18                                          Suite 3200
19                                          San Francisco, CA 94111
                                            T: (415) 633-1908
20                                          F: (415) 633-4980
21                                          bsweeney@hausfeld.com
                                            scho@hausfeld.com
22

23                                          Michael Hausfeld
                                            **HAUSFELD LLP**
24                                          1700 K Street NW
25                                          Suite 650
                                            Washington, DC 20006
26                                          T: (202) 540-7200
27                                          F: (202) 540-7201
                                            mhausfeld@hausfeld.com
28

Scott A. Gilmore
**LAW OFFICE OF SCOTT A.
GILMORE**
1717 K Street, NW, Suite 900
Washington, DC 20006
T: (510) 374-9872
scott.allen.gilmore@gmail.com